Filed 2/10/20

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| HEIDI L. HERPEL et al., | |
| Plaintiffs and Appellants, | E070618 |
| v. | (Super.Ct.No. PSC1404764) |
| COUNTY OF RIVERSIDE et al., | OPINION |
| Defendants and Respondents; | |
| LARRY W. WARD, as County Assessor, etc., | |
| Real Party in Interest and Respondent. | |


APPEAL from the Superior Court of Riverside County. Craig G. Riemer, Judge.

Affirmed.

Winston & Strawn, Sean D. Meenan, Morgan E. Stewart, and Lauren Gailey for

Plaintiffs and Appellants.

1

Gregory P. Priamos, County Counsel, and Ronak Patel, Deputy County Counsel; Perkins Coie, Jennifer A. MacLean, Benjamin S. Sharp, and Meredith R. Weinberg for Defendants and Respondents.

This case concerns whether Riverside County may impose a tax on possessory interests in federally owned land set aside for the Agua Caliente Band of Cahuilla Indians or its members. In 1971, this court held that it may, holding in part that federal law did not preempt the tax. (*Palm Springs Spa, Inc. v. County of Riverside* (1971) 18 Cal.App.3d 372.) The tax was also upheld that year by the Ninth Circuit. (*Agua Caliente Band of Mission Indians v. County of Riverside* (9th Cir. 1971) 442 F.2d 1184.) Since those decisions nearly half a century ago, the United States Supreme Court has articulated a new preemption framework in considering whether states may tax Indian interests, and the Department of the Interior has promulgated new Indian leasing regulations, the preamble of which states that state taxation is precluded. Nevertheless, we conclude, as we did in 1971, that this possessory interest tax is valid.[1]

## I. FACTUAL AND PROCEDURAL HISTORY

The Agua Caliente Band of Cahuilla Indians (the Tribe) is a federally recognized tribe with over 400 members.[2] Its reservation encompasses approximately 31,000 acres,

___

[1] The Ninth Circuit has recently reaffirmed the validity of this tax as well. (*Agua Caliente Band of Cahuilla Indians v. Riverside Cty.* (9th Cir. 2019) 749 Fed. Appx. 650.)

[2] The facts herein are taken from the parties' pretrial stipulation. Also, because the relevant federal statutes and regulations use the term "Indian," we do the same for consistency, even though we recognize that other terms, such as "Native American" or "indigenous," are preferred by many.

spread in a checkerboard pattern, across three cities in Riverside County—Palm Springs, Rancho Mirage, and Cathedral City—as well as unincorporated county areas. Some of that land is owned in trust by the federal government for the benefit of the Tribe (Tribal Trust Land), and some is owned in trust for the benefit of one or more Tribe members (Allotted Land). Although only somewhere between eight to 16 acres of Allotted Land were leased out by Tribe members around the time this court decided *Palm Springs Spa* in 1971, members currently lease out approximately 4,300 acres of Allotted Land under approximately 20,000 lease arrangements. The amount of Tribal Trust Land leased out is trivial in comparison: the Tribe currently leases out only about 15 acres of Tribal Trust Land.

Plaintiffs and appellants Heidi L. Herpel, Judith Fabris, Barbara Etherington, and Roger Etherington each hold a leasehold or other possessory interest in Allotted Land. In 2014, they filed a putative class action against defendants and respondents County of Riverside (the County) and Don Kent, the Riverside County Treasurer-Tax Collector, and against real party in interest and respondent Larry W. Ward, the Riverside County Assessor-County Clerk-Recorder (the Assessor; collectively, defendants). The complaint contained several causes of action, all premised on the contention that the County's possessory interest tax is preempted by federal law as applied to them. The complaint generally defined the class as all lessees of "Indian Land within the County," thereby suggesting the possible inclusion of leased lands of other tribes, but the parties later agreed to limit the class to only possessory interest holders of Allotted Land or Tribal

3

Trust Land (i.e., land owned for the benefit of the Agua Caliente Band of Cahuilla Indians or its members). Notably, the Tribe is not a party to this case.

The parties filed two rounds of cross-motions for summary judgment or adjudication. Taken together, the motions focused almost entirely on whether the possessory interest tax was preempted by federal law on any of three grounds, one based on an interest balancing test announced in *White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136 (*Bracker*); one based on a federal regulation, 25 Code of Federal Regulations part 162.017 (part 162.017); and one based on a federal statute, title 25 United States Code section 5108 (§ 5108; originally enacted as 25 U.S.C. § 465). In adjudicating these motions, the trial court determined that section 5108 did not apply, that part 162.017 did not preempt the tax, and that disputed issues of material fact precluded any judgment as a matter of law under the balancing test stated in *Bracker*. The case thus proceeded to trial.

The trial court bifurcated the issues such that the question of preemption under *Bracker* would be resolved before any class was certified. On stipulated facts, the trial court concluded that the possessory interest tax was not preempted under *Bracker*.[3]

---

[3] The stipulated facts referenced written discovery documents from *Agua Caliente Band of Cahuilla Indians v. Riverside Cty.,* (C.D. Cal. 2017) 2017 U.S. Dist. LEXIS 92592, affd. mem. (9th Cir. 2019) 749 Fed. Appx. 650. There, the Tribe challenged the validity of the same tax at issue here against defendants here, and the federal district court held that the tax was valid. The parties here agreed that documents obtained in discovery in that case "may be used at trial" and that the parties would "not challenge the use of the Tribe's responses to" written discovery in that case. Some, if not all, of the parties' information regarding the Tribe apparently comes from these discovery documents since, as noted earlier, the Tribe is not a party to this case.

Because such a finding rendered class certification unnecessary, the trial court entered judgment in favor of defendants.

## II.  ANALYSIS

On appeal, plaintiffs reassert that the possessory interest tax is preempted by federal law under *Bracker*, part 162.017, and section 5108.  "We apply a de novo standard of review . . . because federal preemption presents a pure question of law [citation]."  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)  However, "when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable."  (*Boling v. Public Employment Relations Board* (2018) 5 Cal.5th 898, 913.)  "The party who claims that a state statute is preempted by federal law bears the burden of demonstrating preemption."  (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 956.)

As we explain, neither *Bracker*, part 162.017, nor section 5108 preempts the possessory interest tax here.

### A.  Bracker *Balancing Test*

Decided in 1980, *Bracker* articulated a new framework for evaluating when a state may "assert[] authority over the conduct of non-Indians engaging in activity on the reservation."  (*Bracker*, *supra*, 448 U.S. at p. 144.)[4]  There, the United States Supreme Court stated that "there is no rigid rule by which to resolve the question whether a

---

[4]  Plaintiffs nowhere contend that they are members of the Tribe.  Judgment was entered in favor of defendants before any class was certified, so there is no dispute that only non-Indian activity is at issue.

5

particular state law may be applied to an Indian reservation or to tribal members."

(*Bracker*, *supra*, 448 U.S. at p. 142.)  "The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law.  Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other."  (*Id.* at p. 143.)  Therefore, when evaluating the activity of non-Indians in this context, courts must "examine[] the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.  This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."  (*Id.* at pp. 144-145.)  "Ambiguities in federal law" should be "construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence."  (*Id.* at pp. 143-144.)

The high court has applied the *Bracker* interest balancing test to state taxes on three occasions, including *Bracker* itself.[5]

---

[5]  In other cases, the United States Supreme Court has considered whether federal law preempts other state regulations of non-Indians on the reservation (e.g., *New Mexico et al. v. Mescalero Apache Tribe* (1983) 462 U.S. 324 [hunting and fishing regulations]

*Bracker* concerned whether Arizona could impose a motor carrier license tax and use fuel tax on Pinetop, a non-Indian timber harvesting corporation operating solely on an Indian reservation. (*Bracker*, *supra*, 448 U.S. at pp. 137-138.) After evaluating the "nature of the state, federal, and tribal interests at stake," the court held that Arizona could not impose the taxes. (*Id.* at pp. 145, 148.)

The strong federal interest arose because the federal government's regulation of Indian timber harvesting was "comprehensive": it "[took] the form of Acts of Congress, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision by the Bureau of Indian Affairs." (*Bracker*, *supra*, 448 U.S. at p. 145.) Regulations covered "a wide variety of matters," and under them, the Bureau of Indian Affairs (the Bureau) "exercise[d] literally daily supervision over the harvesting and management of tribal timber." (*Id.* at p. 147.) Importantly, such regulations covered roads developed by the Bureau: the "administration and maintenance" of Bureau roads were funded by the federal government with contributions from the tribes. (*Id.* at p. 148.)

A strong tribal interest resulted because the tribe's sovereignty and ability to advance its own interests would have been hampered by the taxes. (*Bracker*, *supra*, 448 U.S. at p. 151.) As *Bracker* noted, it was "undisputed that the economic burden of the asserted taxes [would] ultimately fall on the [t]ribe" because a tribal entity had "agreed to reimburse Pinetop for any tax liability incurred as a result of its on-reservation business

(*New Mexico*)), or concluded that *Bracker* does not apply in a given context (e.g., *Wagnon v. Prairie Band Potawatomi Nation* (2005) 546 U.S. 95, 99 [holding that the *Bracker* test "does not apply where, as here, a state tax is imposed on a non-Indian and arises as a result of a transaction that occurs off the reservation."] (*Wagnon*)).

7

activities." (*Id.* at pp. 140, fn. 7, 151.) Moreover, "the imposition of state taxes would [have] adversely affect[ed] the [t]ribe's ability to comply with the sustained-yield management policies imposed by federal law." (*Id.* at pp. 149-150.) Expenditures made "to ensure the continued productivity of the forest" were "largely paid for out of tribal revenues, which are in turn derived almost exclusively from the sale of timber. . . . The imposition of state taxes . . . would [have] effectively diminish[ed] the amount of those revenues and thus [left] the [t]ribe and its contractors with reduced sums with which to pay out federally required expenses." (*Id.* at p. 150.)

Compared to federal and tribal interests, the state interest in *Bracker* was minimal. The two taxes, one of which was a motor carrier license tax and the other of which sought to "'[compensate] the state for the use of [Arizona's] highways,'" were not sufficiently related to Pinetop's activities. (*Bracker*, *supra*, 448 U.S. at p. 150.) As the court noted, "Pinetop's business in Arizona [was] conducted solely on the Fort Apache Reservation," and "[t]he roads at issue have been built, maintained, and policed exclusively by the Federal Government, the [t]ribe, and its contractors." (*Ibid.*) The state's "general desire to raise revenue" was not enough given that the court was "unable to discern a responsibility or service that justifies the assertion of" the taxes. (*Ibid.*)

Thus, *Bracker* was "not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." (*Bracker*, *supra*,

448 U.S. at p. 150.) Given the strong federal and tribe interests combined with a minimal state interest, Arizona could not impose the taxes.[6]

Two years later, the court decided *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico* (1982) 458 U.S. 832 (*Ramah*). The court began its analysis by reiterating the unique preemption inquiry the context required. "The question whether federal law, which reflects the related federal and tribal interests, pre-empts the State's exercise of its regulatory authority is not controlled by standards of pre-emption developed in other areas." (*Id.* at p. 838.) At bottom, however, *Ramah* was "indistinguishable in all relevant respects from" *Bracker*. (*Ramah*, *supra*, at p. 839.)

*Ramah* concerned a tax "imposed on the gross receipts that a non-Indian construction company receive[d] from a tribal school board for the construction of a school for Indian children on the reservation." (*Ramah*, *supra*, 458 U.S. at p. 834; see also *id.* at p. 844.) In evaluating the federal interest, the court stated that "[f]ederal

---

[6] *Bracker* also relied on a case that it found "in all relevant aspects indistinguishable," *Warren Trading Post Co. v. Arizona Tax Commission* (1965) 380 U.S. 685 (*Warren Trading Post*). (*Bracker*, *supra*, 448 U.S. at pp. 152-153.) There, the court held that a "'gross proceeds'" tax on a non-Indian company operating a retail trading business on the Navajo Indian Reservation was preempted. (*Warren Trading Post*, *supra*, at pp. 685-686.) Instructive about *Warren Trading Post* was the presence of "'detailed regulations,' specifying 'in the most minute fashion,' [citation], the licensing and regulation of Indian traders," the fact that "the economic burden of the state taxes would eventually be passed on to the Indians themselves," and the fact that "'federal legislation [had] left the State with no duties or responsibilities respecting the reservation Indians." (*Bracker*, *supra*, at p. 152.) Instructive to us in addition, although not mentioned in *Bracker*, is that in *Warren Trading Post* "the Federal Government [had] provided for roads, education and other services needed by" the Navajo tribe, highlighting the state's diminished interest in imposing its gross proceeds tax on the trading business. (*Warren Trading Post*, *supra*, at p. 690.)

9

regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive." (*Id.* at p. 839.) After describing the "numerous statutes" Congress had enacted "empowering the [Bureau] to provide for Indian education both on and off the reservation," the court noted that the "detailed regulatory scheme" promulgated under statutory authority "governing the construction of autonomous Indian educational facilities is at least as comprehensive as the federal scheme found to be pre-emptive in" *Bracker*. (*Ramah, supra,* at pp. 839-841.) The tribal interest was also strong, in part because the "ultimate burden" of the tax fell on the tribe. (*Id.* at pp. 844.) And as in *Bracker*, the state interest was minimal: New Mexico asserted no "specific, legitimate regulatory interest to justify the imposition of its gross receipts tax." (*Id.* at p. 843.) In this regard, the court noted that the state "declined to take any responsibility for the education of these Indian children." (*Id.* at p. 843; see also *id.* at p. 834 [stating that "Ramah Navajo children attended a small public high school near the reservation until the State closed this facility in 1968" and that "[b]ecause there were no other public high schools reasonably close to the reservation, the Ramah Navajo children were forced either to abandon their high school education or to attend federal Indian boarding schools far from the reservation" before the tribe stepped in to "remedy this situation."].) Although New Mexico argued that it provided services to the construction company "off the reservation," the court "fail[ed] to see" how those benefits could "justify a tax imposed on the construction of school facilities on tribal lands." (*Id.* at p. 844, italics omitted; see also *ibid.* ["New Mexico has not explained the source of its power to levy

10

such a tax in this case where the 'privilege of doing business' on an Indian reservation is exclusively bestowed by the Federal Government."].)  Finally, the court was "unpersuaded" by the state's argument that the services it provided to the tribe itself justified the tax, given that New Mexico "[did] not suggest that these benefits [were] in any way related to the construction of schools on Indian land."  (*Id.* at p. 845, fn. 10.) The state's interest therefore "amount[ed] to nothing more than a general desire to increase revenues."  (*Id.* at p. 845.)

Like *Bracker*, *Ramah* emphasized what the state was *not* doing:  "In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying [the] tax."  (*Ramah*, *supra*, 458 U.S. at p. 843; see also *id.* at p. 843, fn. 7 ["This case would be different if the State were actively seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for Ramah Navajo children."].)  It therefore found the tax preempted.

In *Cotton Petroleum Corp. v. New Mexico* (1988) 490 U.S. 163 (*Cotton Petroleum*), the court upheld the tax.  There, Cotton Petroleum (Cotton), a non-Indian company, paid oil and gas production taxes "amount[ing] to about 8 percent" of the value of its production to New Mexico.  (*Id.* at p. 168.)  Combined with similar taxes imposed by the Jicarilla Apache Tribe on leases covering parts of the reservation, Cotton in all paid a "total rate of 14 percent" on reservation wells.  (*Id.* at p. 169.)

11

The court stated that it has "applied a flexible pre-emption analysis sensitive to the particular facts and legislation involved" and noted that "determining whether federal legislation has pre-empted state taxation of lessees of Indian land is primarily an exercise in examining congressional intent," against which "the history of tribal sovereignty serves as a necessary 'backdrop.'" (*Cotton Petroleum*, *supra*, 490 U.S. at p. 176.)

*Cotton Petroleum* rejected Cotton's assertion that the relevant federal legislation "exhibit[ed] a strong federal interest in guaranteeing Indian tribes the maximum return on their oil and gas leases." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 177.) According to the court, the legislation at issue, the Indian Mineral Leasing Act of 1938, 52 Stat. 347 (the 1938 Act), "neither expressly permit[ted] state taxation nor expressly preclude[d] it." (*Cotton Petroleum*, *supra*, at p. 163.) It then turned to the legislative history. A letter from the Secretary of the Interior accompanying the Senate and House Reports to the 1938 Act stated that current law was inadequate in giving "'the Indians the greatest return from their property'" because discoverers of mineral deposits on Indian lands received fewer rights than those on non-Indian lands. (*Cotton Petroleum*, *supra*,. at p. 178, italics omitted.) "'For instance, on the public domain the discoverer of a mineral deposit gets extralateral rights and can follow the ore beyond the side lines indefinitely, while on the Indian lands under the act of June 30, 1919, he is limited to the confines of the survey markers not to exceed 600 feet by 1,500 feet in any one claim.'" (*Cotton Petroleum*, *supra*, at p. 178.) According to the letter, the 1938 Act "'would permit the obtaining of sufficient acreage to remove the necessity for extralateral rights with all of its attending

12

controversies.'" (*Ibid.*)  As the court concluded, "[r]ead in the broadest terms possible," the letter "suggest[ed] that Congress sought to remove 'disadvantages in [leasing mineral rights] on Indian lands that are not present in applying for a claim on the public domain.'" (*Id.* at p. 179.)  "It [was] thus apparent that Congress was not concerned with state taxation, but with matters such as the unavailability of extralateral mineral rights on Indian land." (*Ibid.*)  The court "thus agree[d] that a purpose of the 1938 Act [was] to provide Indian tribes with badly needed revenue, but [found] no evidence for the further supposition that Congress intended to remove all barriers to profit maximization." (*Id.* at p. 180.)  Accordingly, the federal interest was more limited than in *Bracker* or *Ramah*, even though the court noted that "the federal and tribal regulations in this case [were] extensive." (*Id.* at p. 186, fn. omitted.)[7]

The tribal interest also differed from *Bracker* and *Ramah* "in that the District Court [in *Cotton Petroleum*] found that . . . '[n]o economic burden falls on the tribe by virtue of the state taxes.'" (*Cotton Petroleum*, *supra*, 490 U.S. at p. 171.)  This was a key distinction because in *Bracker* "the economic burden of the taxes ultimately fell on the [t]ribe," in *Ramah* "the economic burden of the tax [also] ultimately fell on the [t]ribe," and, the court emphasized:  "It is important to keep in mind that the primary burden of the state taxation [here] falls on the non-Indian taxpayers." (*Cotton Petroleum*, *supra*, at

---

[7]  With regard to the regulations, *Cotton Petroleum* also noted that because New Mexico "regulate[d] the spacing and mechanical integrity of wells located on the reservation," the regulations were "not exclusive, as were the regulations in" *Bracker* and *Ramah*, despite being "extensive." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 186.)

pp. 184, 187, fn. 18.) Moreover, in finding a reduced tribal interest, the court also relied on the district court's finding that "the [t]ribe could, in fact, increase its taxes without adversely affecting on-reservation oil and gas development." (*Id.* at p. 185.)

Finally, with regard to the state interest, *Cotton Petroleum* concluded that, unlike *Bracker* and *Ramah*, both of which "involved complete abdication or noninvolvement of the State in the on-reservation activity," "[t]his [was] not a case in which the State has had nothing to do with the on-reservation activity, save tax it." (*Cotton Petroleum*, *supra*, 490 U.S. at pp. 185-186.) In this regard, the court again relied on the district court, which found that "'New Mexico provide[d] substantial services to both the Jicarilla Tribe and Cotton,' costing the State approximately $3 million per year." (*Id.* at p. 185.)

Given the difference in interests when compared to *Bracker* and *Ramah*, *Cotton Petroleum* concluded that the tax was not preempted. (*Cotton Petroleum*, *supra*, 490 U.S. at p. 186.) It continued: "It is, of course, reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the [t]ribe of those leases, and the ability of the [t]ribe to increase its tax rate. Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, is simply too indirect and too insubstantial to support Cotton's claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, absent some special factor such as those present in *Bracker* and [*Ramah*], would be to

14

return to the pre-1937 doctrine of intergovernmental tax immunity." (*Id.* at p. 163, fn. omitted.)[8]

With these cases in mind, we consider whether the County's possessory interest tax is preempted under the "particularized inquiry" required by *Bracker*. We first describe what that tax is and what services its funds help provide.

### 1. Possessory Interest Tax

Article XIII of the California Constitution provides that, "[u]nless otherwise provided by this Constitution or the laws of the United States," "[a]ll property is taxable." (Cal. Const., art. XIII, § 1; see also Rev. & Tax. Code, § 201 ["All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation under this code."].) "'Property' includes all matters and things, real, personal, and mixed, capable of private ownership." (Rev. & Tax. Code, § 103.) "Real property" in turn includes "[t]he possession of . . . or right to the possession of land." (*Id.*, § 104, subd. (a); see also *id.*, § 107 [defining "possessory interests"]; Cal. Code Regs., tit. 18, § 20.)

Since as early as 1859, the California Supreme Court has held in an unbroken line of cases that a possessory interest in land may be taxable even when the land itself is exempt or immune from taxation. (See *State v. Moore* (1859) 12 Cal. 56, 70-71 ["Several persons may have, in the same land, a property which is subject to taxation, and it is not perceived that the fact, that the property of the Government is exempt from

---

[8] The doctrine of intergovernmental tax immunity is discussed at part II.C., *post*.

15

taxation, affects the right to tax the interest which private individuals have acquired in the same property."]; see also, e.g., *People v. Shearer* (1866) 30 Cal. 645; *Kaiser Co., Inc. v. Reid* (1947) 30 Cal.2d 610.)[9] As our Supreme Court has explained, when an exempt or immune entity leases its property, "[i]t creates valuable privately-held possessory interests, and there is no reason why the owners of such interests should not pay taxes on them just as lessees of private property do through increased rents. Their use is not public, but private, and as such should carry its share of the tax burden." (*Texas Co. v. County of Los Angeles* (1959) 52 Cal.2d 55, 63.) This means that, in the context of Indian tribes, although the state cannot directly tax reservation lands belonging to the federal government (*Cotton Petroleum*, *supra*, 490 U.S. at p. 175, citing *McCulloch v. Maryland* (1819) 17 U.S. (4 Wheat.) 316), it may tax privately held possessory interests in those lands in the absence of preemption (see *New Mexico*, *supra*, 462 U.S. at p. 333).

To collect property taxes (including the possessory interest tax), the Assessor first locates all taxable property in the County, identifies the owners, and determines the property interest. The County Auditor-Controller then calculates the taxes owed on each taxable property interest by applying to each interest the appropriate ad valorem taxes, including the general tax levy capped at 1 percent under Proposition 13 (Cal. Const., art.

---

[9] The United States Supreme Court has agreed as well. (See, e.g., *United States v. County of Fresno* (1977) 429 U.S. 452 [upholding California's possessory interest tax "in housing owned and supplied to [federal employees] by the Federal Government as part of their compensation"].)

XIII A, § 1).[10]  The County Tax Collector then prepares property tax bills based on those calculations and collects the taxes.  Once collected, the County Auditor-Controller distributes portions of those revenues to various recipient entities pursuant to state law.

In addition to being allocated to cities and other entities within the County, property tax revenues help fund County services including education, fire, police, health and sanitation, sheriffs, district attorneys and public defenders, road maintenance, flood control, and recreational and cultural services.  The cities spend their property tax revenues on similar government services such as libraries, fire, and police.  The County does not maintain records separating revenues generated from the possessory interest tax from revenues generated from other property taxes, so it does not know how possessory interest tax revenues are specifically allocated.  The parties estimate, however, that the County receives approximately $22.8 million per year in possessory interest tax revenues from Allotted Land and Tribal Trust Land.  The greatest portion of that revenue, approximately $13.2 million in fiscal year 2013-2014, goes to fund education services, while portions are also allocated to the Cities of Palm Springs, Rancho Mirage, and Cathedral City.  Water and flood control agencies, regional medical centers, parks, the public cemetery, and mosquito and vector control also receive portions of these revenues. In fiscal year 2013-2014, for instance, an estimated $548,000 of possessory interest tax

---

[10]  "An ad valorem tax is a tax levied on property in proportion to its value, as determined by assessment or appraisal." (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1124.)  Property interests may be subject to multiple ad valorem taxes. (See Cal. Const., art. XIII A, § 1, subds. (b)-(c); *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 19.)

revenue was allocated to the Riverside County Flood Control and Conservation District, and an estimated $228,000 to the Coachella Valley Mosquito & Vector Control District.

Allotted Land and Tribal Trust Land are interspersed with nonreservation land, so many services are provided without regard to whether the owner is a private person or the federal government in trust. Access to public schools, courts, and libraries, for instance, do not depend on whether the land is part of the Tribe's reservation, nor do services such as flood, mosquito, and vector control, and there is no indication that entitlement to these services would change if the possessory interest tax were invalidated against non-Indian lessees of Allotted Land and Tribal Trust Land.

### 2. *Application of* Bracker

As we now consider the federal, tribal, and state interests at stake, we heed *Bracker*'s admonition that this "*particularized* inquiry" calls for a determination of "whether, *in the specific context*, the exercise of state authority would violate federal law." (*Bracker*, *supra*, 448 U.S. at p. 145, italics added.) Nevertheless, *Cotton Petroleum* is controlling here.

### a. *Federal Interest*

In considering the federal government's interests, we note, as plaintiffs do, that the Department of the Interior has promulgated an expansive set of regulations governing leases on Indian land. (25 C.F.R. §§ 162.001-703 (the Leasing Regulations).) As the preamble to the Leasing Regulations itself states, they "cover all aspects of leasing," such as how to obtain a lease; mandatory lease provisions; construction, ownership, and

18

removal of permanent improvements on leased land; recordation; delinquent payments; secretarial cancellation of a lease for violations; and abandonment of leased premises. (77 Fed.Reg. 72440, 72447 (Dec. 5, 2012); 162 C.F.R. § 162.001(b).)

Neither party, however, focuses on how the applicable *statute* or the congressional policies underlying it should guide our analysis, despite their importance in the *Bracker* line of cases. (See *Bracker*, *supra*, 448 U.S. at p. 145, fn. 12 [describing "long history" of "[f]ederal policies with respect to tribal timber"]; *Ramah*, *supra*, 458 U.S. at p. 839 [evaluating history of "[t]he Federal Government's concern with the education of Indian children" through congressional acts]; *Cotton Petroleum*, *supra*, 490 U.S. at pp. 177-183 [evaluating 1938 Act].) As we explain, the mere fact that the Leasing Regulations are extensive does not require us to conclude that the federal interest strongly supports preemption.

Leases on Allotted Land and Tribal Trust Land are governed by section 415 of title 25 of the United States Code, first enacted in 1955 under the Act of August 9, 1955, Pub.L. No. 255-615, 69 Stat. 539 (the Long-Term Leasing Act). As originally enacted, the Long-Term Leasing Act provided that "any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for" business, residential, or other enumerated purposes. (*Id.*, § 1.) Most leases were limited to a 25-year term, although business and residential leases (among others) could be extended at the end of that term for another 25 years. (*Ibid.*) The statute has since been amended to provide that "leases of land on the Agua Caliente

19

(Palm Springs) Reservation," as well as on reservation lands of several other tribes, "may be for a term of not to exceed ninety-nine years." (25 U.S.C. § 415(a).)

Although the Long-Term Leasing Act provided that "all leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior" (Long-Term Leasing Act, § 1), nothing in the text of the Long-Term Leasing Act signals an intent on the part of Congress for the federal government to exclude state taxation or otherwise exercise exclusive control over everything in connection with leases on Indian lands. In this sense, the Long-Term Leasing Act is similar to the 1938 Act considered in *Cotton Petroleum*. (*Cotton Petroleum*, *supra*, 490 U.S. at p. 177 ["The 1938 Act neither expressly permits state taxation nor expressly precludes it . . . ."].)

Congress's goal in enacting the Long-Term Leasing Act, moreover, was similar to that of the 1938 Act considered in *Cotton Petroleum* in that both sought nothing more than the removal of restrictions imposed solely on Indian land—restrictions that put tribal economic activity at a disadvantage. As a letter from the Assistant Secretary of the Interior included in the House Report to the Long-Term Leasing Act indicated, Indian leasing laws at the time generally "preclude[d] Indians from leasing their restricted lands, whether tribal or allotted, for periods longer than 5 years." (1955 U.S. Code Cong. & Admin. News, pp. 2691-2696, at p. 2693.) "The absence of authority for long-term leases discriminate[d] against Indians who own restricted lands that are suitable for the location of business establishments, residential subdivisions, summer homes, airports, or for other purposes that require[d] a substantial outlay of capital by the prospective

lessee." (*Ibid.*) "Indians who [were] in a position to go into business for themselves [were] sometimes deterred because of their inability to obtain long-term leases on tribal land or land owned by other Indians." (*Id.* at p. 2694.) The letter thus concluded that "removal of unnecessary restrictions from Indian property should be a fundamental objective of our Indian policy" and that "[t]he restriction against long-term leases of Indian land is one restriction that can, and in all fairness should, be removed at once." (*Ibid.*) The House Report similarly explained that the lack of legal authority for long-term leases "deprived" the Indians "of much needed income," and that the bill therefore sought to "remove these unfair restrictions." (*Id.* at pp. 2691-2692.) Thus, as in *Cotton Petroleum*, the legislative history "suggests that Congress sought to remove 'disadvantages . . . on Indian lands that [were] not'" otherwise present, and that "[i]t is thus apparent that Congress was not concerned with state taxation." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 179.) We must evaluate the federal interest with this in mind.

The Leasing Regulations are extensive; there is no real disagreement about that. However, regulations were extensive in *Bracker*, *Ramah*, and *Cotton Petroleum*, even though the high court's conclusions about the weight of the federal interests in those cases varied. Given the similarities in the legislative history and congressional policy behind the Long-Term Leasing Act and the 1938 Act as analyzed in *Cotton Petroleum*, that case, more so than *Bracker* and *Ramah*, provides the appropriate guidance here.[11]

---

[11] As stated in footnote 7, *ante*, *Cotton Petroleum* distinguished the regulations at issue there from those in *Bracker* and *Ramah*. (*Cotton Petroleum*, *supra*, 490 U.S. at p. 186.) New Mexico "regulate[d] the spacing and mechanical integrity of wells located on

21

We therefore do not consider the nature of the federal government's interest in prohibiting the possessory interest tax to strongly support preemption. We note that this puts us in disagreement with courts that have described the federal interest in the context of the Leasing Regulations as similar to those in *Bracker* and *Ramah*, whether or not in the particular context of this or other taxes. (See *Seminole Tribe of Fla. v. Stranburg* (11th Cir. 2015) 799 F.3d 1324, 1341 ["Regulatory framework governing the leasing of Indian land" "is sufficient to bring the federal interests within the scope of *Bracker* and *Ramah*."] (*Seminole Tribe*); *Segundo v. City of Rancho Mirage* (9th Cir. 1987) 813 F.2d 1387, 1392 ["[T]he federal statutes authorizing the leasing of trust lands and the regulations governing such leasing . . . constitute a comprehensive regulatory scheme with preemptive effect on state and local laws."]; *Agua Caliente Band of Cahuilla Indians v. Riverside County*, *supra*, 2017 U.S. Dist. LEXIS 92592 [at *35] ["the Court concludes that the federal interests here, like those at stake in *Bracker* and *Ramah*, are pervasive enough to preclude the burdens of a tax, absent sufficient state interests"], affd. mem. (9th Cir. 2019) 749 Fed. Appx. 650.) We add, however, that none of these cases consider the Leasing Regulations in the context of the Long-Term Leasing Act or the congressional policy behind it.

the reservation," so the regulations in *Cotton Petroleum* were "not exclusive, as were the regulations in" *Bracker* and *Ramah*. (*Cotton Petroleum*, *supra*, at p. 186.) However, because whether regulations are exclusive appears to depend on whether a *state* has chosen to regulate activity alongside (or despite) federal authority, and because "determining whether federal legislation has preempted state taxation of lessees of Indian land is primarily an exercise in examining *congressional* intent" (*id.* at p. 176, italics added), whether the Leasing Regulations are "exclusive" as opposed to merely "extensive" does not strongly affect our analysis.

To be sure, plaintiffs do not argue for the same federal interest as did Cotton, the oil and gas company in *Cotton Petroleum*, which argued for a "strong federal interest in guaranteeing Indian tribes the maximum return on their oil and gas leases." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 177.) Plaintiffs here do not argue that the federal government's interest is to help the Tribe maximize profits. Rather, they point to the federal government's "established policy of encouraging tribal self-governance and tribal economic self-sufficiency." (77 Fed. Reg. 72440, 72446 (Dec. 5, 2012); see also *Bracker*, *supra*, 448 U.S. at p. 149 [noting "general federal policy of encouraging tribes 'to revitalize their self-government' and to assume control over their 'business and economic affairs'"].) But this policy, important as it is as a lofty goal, was also raised in *Cotton Petroleum* and ultimately deemed insufficient. (*Cotton Petroleum*, *supra*, at p. 177 [rejecting Cotton's assertion that "the New Mexico taxes are pre-empted by the 'federal laws and policies which protect tribal self-government and strengthen impoverished reservation economics'"].) Under these circumstances, we see no stronger federal interest than in *Cotton Petroleum*.

> b. *Tribal Interest*

Turning to the Tribe's interest, we again find that the facts here are closely aligned with those in *Cotton Petroleum*, the only case in the *Bracker* line where the burden of the tax did not fall on the tribe. (Compare *Bracker*, *supra*, 448 U.S. at p. 151 ["It is undisputed that the economic burden of the asserted taxes will ultimately fall on the [t]ribe."] and *Ramah*, *supra*, 458 U.S. at p. 844 ["Ultimate burden" for the tax "falls on

23

the tribal organization."] with *Cotton Petroleum*, *supra*, 490 U.S. at p. 185 ["'No economic burden falls on the tribe by virtue of the state taxes.'"].)

The parties do not dispute that the burden of the tax here falls only on the possessory interest holder: they stipulated before the trial court that "[t]he non-Indian lessee of Tribal Trust Land or of Allotted Land is responsible for paying the [possessory interest tax], and the County has no recourse against the lessor for non-payment" of the tax. As noted, the fact that the tribe did not bear the burden of the tax was crucial to *Cotton Petroleum*'s analysis. (See also *Wagnon*, *supra*, 546 U.S. at p. 101 ["[u]nder our Indian tax immunity cases, the 'who' and the 'where' of the challenged tax have significant consequences."].) Moreover, this is not like *Bracker*, where the taxes would have left the tribe with "reduced sums with which to pay out federally required expenses" imposed by "sustained-yield management policies." (*Bracker*, *supra*, 448 U.S. at pp. 150, 149.) Plaintiffs here point to no federally required expenditures imposed by specific policies. Accordingly, the tribal interest does not mandate preemption here.[12]

---

[12]  In *Seminole Tribe*, the Eleventh Circuit held that a Florida tax imposed on lessees, similar in some ways to the County's possessory interest tax, was preempted by federal law under *Bracker* and section 5108. (*Seminole Tribe*, *supra*, 799 F.3d at pp. 1335-1343.) In doing so, the court assumed that the "legal incidence" of Florida's tax "[fell] on the non-Indian lessees." (*Id.* at p. 1331, fn. 8.) That fact, however, was mentioned in the court's analysis under section 5108, and neither this fact nor the issue of who bore the ultimate or economic burden of the tax was ever mentioned or explicitly relied upon in its *Bracker* analysis. (See *Seminole Tribe*, *supra*, at pp. 1335-1343.) We therefore disagree with *Seminole Tribe*'s *Bracker* analysis for this additional reason. (See p. 23, *ante*.)

The tribal interest here is similar to that in *Cotton Petroleum* in another important way: here and in *Cotton Petroleum*, there is no evidentiary showing that the tribe would be negatively affected if it imposed its own taxes on top of the state or local tax.[13] In *Cotton Petroleum*, the district court found the opposite, that "the [t]ribe could, in fact, increase its taxes without adversely affecting on-reservation oil and gas development." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 185.) Here, plaintiffs fail to show that the Tribe would be harmed if it imposed its own possessory interest tax. On stipulated facts, the trial court found that "there is no evidence that the [possessory interest tax] has any disproportionate impact on the tribe's leasing efforts or otherwise places the tribe at an economic disadvantage vis-à-vis non-Indian lessors in the area." According to the parties, "[t]he Tribe acknowledges that it 'did not do any quantification or any unique technical studies on' the [possessory interest tax]'s alleged burden on [lessors of Allotted Land] or on Allotted Land."[14] Moreover, the fact that marginal demand for leases on Allotted Land or Tribal Trust Land could go down if the Tribe also collected its own possessory interest tax alone is not enough to show harm, as *Cotton Petroleum* found no

---

[13] According to the parties, the Tribe has enacted its own version of a possessory interest tax but "has never attempted to assess or collect" it.

[14] The parties appear to quote from a document where the Tribe made this statement, but the stipulation does not cite the source of the quotation. (See fn. 3, *ante*.)

25

harm despite the additional 6 percent of tax imposed on reservation wells. (See *Cotton Petroleum, supra*, at pp. 168-169.)[15]

Ultimately, we need not decide once and for all whether the Tribe could impose its own version of a possessory interest tax without adversely affecting its economic development. We need only conclude, and do, that plaintiffs have not demonstrated that the County's possessory interest tax significantly and negatively affects the Tribe's interests.

---

[15] *Cotton Petroleum* acknowledged that New Mexico's oil and gas taxes would have "at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate," but it concluded that "[a]ny impairment . . . that might be caused by these effects . . . is simply too indirect and too insubstantial to support [a] claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, *absent some special factor* such as those present in *Bracker* and [*Ramah*], would be to return to the pre-1937 doctrine of intergovernmental tax immunity." (*Cotton Petroleum, supra*, 490 U.S. at p. 187, italics added, fn. omitted.)

In *Seminole Tribe*, the Eleventh Circuit concluded that "the extensive and exclusive federal regulation of Indian land leasing provides the 'special factor'" quoted in *Cotton Petroleum* above. (*Seminole Tribe, supra*, 799 F.3d at p. 1341.) Thus, because the Leasing Regulations were extensive and exclusive, the economic consequences of the Florida tax on the tribe were sufficient for a finding of preemption. (*Id.* at pp. 1340-1341.) However, *Cotton Petroleum* noted that the oil and gas regulations at issue there were "extensive," although "not exclusive" (*Cotton Petroleum, supra*, 490 U.S. at p. 186), and as noted in footnote 11, *ante*, whether or not regulations are exclusive should not, by itself, be determinative. We therefore do not believe that the "special factor" referred to in *Cotton Petroleum* is extensive and exclusive federal regulation. Rather, we construe the "special factor" as a reference to who bears the ultimate burden for the tax. This is because in the footnote at the end of the sentence using the phrase "special factor," the court notes that "[i]t is important to keep in mind that the primary burden of the state taxation falls on the non-Indian taxpayers." (*Id.* at p. 187, fn. 18.) Because, as noted, the Tribe does not bear the ultimate burden for the tax, this statement from *Cotton Petroleum* does not point toward preemption, even though *Seminole Tribe* held otherwise.

### c. State Interest

Finally, as in *Cotton Petroleum*, the state's interest is sufficient to justify the County's possessory interest tax.

"The exercise of state authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity." (*New Mexico*, *supra*, 462 U.S. at p. 336; see also *Bracker*, *supra*, 448 U.S. at pp. 148-149 [finding minimal state interest where Arizona was "unable to identify any regulatory function or service performed by the State that would justify the assessment of taxes for activities on Bureau and tribal roads within the reservation."].)

Here, the on-reservation activity being taxed is the private possession—whether commercial, residential, or otherwise—of exempt or immune land. (See 25 U.S.C. § 415(a) [listing types of permissible leases].) The land can be leased for terms of up to 99 years (*ibid.*), and there are many state services that would have a substantial connection with such extended activity. In fact, the undisputed facts list several: education, fire, police, health and sanitation, road maintenance, and flood control, among others discussed above.

The stipulated facts further reveal that virtually all essential governmental services in connection with Allotted Land and Tribal Trust Land are provided by the County, not the Tribe. For instance, the Tribe does not provide governmental services to Allotted Land outside of providing environmental review and building code enforcement services,

27

and then only to certain parcels in unincorporated areas of the County. The Tribe similarly does not provide governmental services to Tribal Trust lands outside six highly circumscribed exceptions.[16] The Tribe does not provide any emergency fire services, nor does it provide public education to non-Indian lessees of Allotted Land or Tribal Trust Land.

This is thus not a case where, as in *Bracker*, any roads or similar structures "have been built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors." (*Bracker*, *supra*, 448 U.S. at p. 150.; see also *Warren Trading Post*, *supra*, 380 U.S. at p. 690 [noting that "the Federal Government provided for roads, education and other services needed by" the Navajo tribe].) Nor is this a case where the state, through the County, has "declined to take any responsibility" for providing services to the Tribe related to what the tax seeks to recover; if anything, the facts here show quite the opposite. (*Ramah*, *supra*, 458 U.S. at p. 843; see also *Cotton Petroleum*, *supra*, 490 U.S. at p. 185 [*Bracker* and *Ramah* "involved complete abdication or noninvolvement of the State in the on-reservation activity."].) Rather, this is a case where, like *Cotton*

---

[16] First, the Tribe provides environmental review and building code enforcement services to certain parcels (like those provided to certain Allotted Land in unincorporated areas), but the Tribe collects fees to cover its provision of those services. Second, the Tribe provides flood protection services in portions of Indian Canyons and Tahquitz Canyon, although the county provides flood protection services to those areas as well. Third, the Tribe provides occupational safety code and food safety code enforcement services. Fourth, the Tribe provides road maintenance services on the South Palm Canyon Road right-of-way. Fifth, the Tribe works with the Environmental Protection Agency on storm water permitting services and waste water permitting services. And sixth, the Tribe delivers potable water to the Trading Post at Indian Canyons.

28

*Petroleum*, the facts demonstrate that the state provides substantial services benefitting non-Indians and the Tribe alike.  (See *Cotton Petroleum*, *supra*, at p. 171, fn. 7 [noting that the district court "found that New Mexico provides services on the reservation not provided by either the [t]ribal or Federal Governments, and provides additional services off the reservation that benefit the reservation and members of the [t]ribe"].)  These services, furthermore, are not limited to benefitting plaintiffs "off the reservation."  (See *Ramah*, *supra*, at p. 844, italics omitted.)  The state's interest is therefore strong.

In contending otherwise, plaintiffs rely on *Seminole Tribe*, where, as noted, the Eleventh Circuit held that a tax imposed on lessees was preempted by federal law under *Bracker* and section 5108.  (*Seminole Tribe*, *supra*, 799 F.3d at pp. 1335-1343.)  *Seminole Tribe* held that services "including law enforcement, criminal prosecution, and health services, as well as 'intangible off-reservation benefits . . . such as infrastructure and transportation services'" were not "tied to the business of renting commercial property on Indian land."  (*Id.* at pp. 1341-1342.)  Plaintiffs also rely on two other federal circuit cases, *Hoopa Valley Tribe v. Nevins* (9th Cir. 1989) 881 F.2d 657 (*Hoopa Valley Tribe*) and *Crow Tribe of Indians v. State of Montana* (9th Cir. 1981) 650 F.2d 1104 (*Crow Tribe of Indians*), in further contending that the County's services lack sufficient connection to the activity being taxed.

A comparison of the taxes at issue in the cases, however, shows why plaintiffs' reliance is unfounded.  Although both the County's possessory interest tax and the Florida tax at issue in *Seminole Tribe* are imposed on lessees of Indian land, only

29

Florida's tax is "a tax on the 'privilege [of engaging] in the business of renting, leasing, letting, or granting a license for the use of any real property' in the state." (*Seminole Tribe*, *supra*, 799 F.3d at p. 1326.) Florida's tax was thus a business license tax that, unlike the County's tax, closely resembled the preempted tax in *Ramah*. (See *Ramah*, *supra*, 458 U.S. at p. 844 ["New Mexico has not explained the source of its power to levy . . . a tax in this case where the 'privilege of doing business' on an Indian reservation is exclusively bestowed by the Federal Government."].)

Moreover, *Seminole Tribe*, *Hoopa Valley Tribe*, and *Crow Tribe of Indians* all involved taxes on business activity only. (See *Seminole Tribe*, *supra*, 799 F.3d at p. 1326 [business license tax]; *Hoopa Valley Tribe*, *supra*, 881 F.2d at p. 658 [timber yield tax]; *Crow Tribe of Indians*, *supra*, 650 F.2d at p. 1108 [coal severance tax].) Whatever the merits of holding that government services such as "road, law enforcement, welfare, and health care services" (*Hoopa Valley Tribe*, *supra*, at p. 661) are not sufficiently connected to taxes on only business activity, we view such services as sufficiently connected when, as here, the tax extends more broadly to cover residential activity as well.

Consider someone who leases Allotted Land or Tribal Trust Land for residential purposes, which the stipulated facts show is common. Even if the tenant works or operates a business solely on non-Indian land, the activity that the possessory interest tax reaches—which is, broadly speaking, the act of residing on otherwise tax-exempt land— is substantially related to the many services the County provides. Most notably, if the tenant has children, then those children are provided access to public schools, which the

30

Tribe does not provide to non-Indian lessees, and which is partially funded by approximately $13.2 million per year from possessory tax revenues from Allotted Land and Tribal Trust Land alone. It would be difficult to say that, under those circumstances, the County has no "legitimate regulatory interest served by the taxes [it] seek[s] to impose." (*Bracker*, *supra*, 448 U.S. at p. 150.) Accordingly, given the differences between the County's possessory interest tax and the taxes on commercial activity at issue in *Seminole Tribe*, *Hoopa Valley Tribe*, and *Crow Tribe of Indians*, we find those cases distinguishable.

In sum, like *Cotton Petroleum*, "[t]his is not a case in which the State has had nothing to do with the on-reservation activity, save tax it." (*Cotton Petroleum*, *supra*, 490 U.S. at p. 186.) Rather, it is a case "in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." (*Bracker*, *supra* 338 U.S. at p. 150; see also *Ramah*, *supra*, 458 U.S. at p. 843 [distinguishing facts before it from a situation where the state "seek[s] to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying the tax"].) We therefore find the County's possessory interest tax permissible under *Bracker*.

B. *Part 162.017*

Plaintiffs next contend that one of the Leasing Regulations, part 162.017, preempts the County's possessory interest tax. In this regard, plaintiffs rely both on the text of part 162.017 and the preamble to the Leasing Regulations, the latter of which states that "[t]he Federal statutory scheme for Indian leasing . . . precludes State taxation." (77 Fed.

31

Reg. 72440, 72447 (Dec. 5, 2012); see also *ibid.* [Leasing Regulations "occupy and preempt the field of Indian leasing" and "leave[] no room for State law"]). We disagree.

As pertinent here, part 162.017(c) provides that "[s]ubject only to applicable Federal law, the leasehold or possessory interest is not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State. Leasehold or possessory interests may be subject to taxation by the Indian tribe with jurisdiction."[17]

The dispositive phrase is "[s]ubject only to applicable Federal law." That is, unless "applicable Federal law" allows it, the County cannot impose its tax on plaintiffs' possessory interests. But *Bracker* is obviously "applicable Federal law," and as we have just concluded, the County's possessory interest tax is valid under *Bracker*. As a result, part 162.017 does not expressly preempt the tax.[18]

Given this unambiguous language, we need not venture beyond the text of part 162.017 to consider issues such as agency deference. (See *Kisor v. Wilkie* (2019)

---

[17] Part 162.017(a) is substantively identical, except that it refers to permanent improvements on leased Indian land instead of possessory interests: "Subject only to applicable Federal law, permanent improvements on the leased land, without regard to ownership of those improvements, are not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State. Improvements may be subject to taxation by the Indian tribe with jurisdiction."

[18] If, as plaintiffs argue, "applicable Federal law" never includes *Bracker*, then part 162.017 would conflict with the high court's opinion insofar as it prohibits a tax that *Bracker* allows. We know of no authority stating that a decision by the United States Supreme Court must give way to a federal *regulation*, notwithstanding Congress's "plenary power to legislate in the field of Indian affairs" (*Cotton Petroleum, supra*, 490 U.S. at p. 192), and we decline to construe part 162.017 in such a way here. Also, as discussed in part II.C., *post*, "applicable Federal law" here does not include section 5108.

32

588 U.S. __, 139 S.Ct. 2400, 2415 ["If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law."].)[19] Because the preamble to the Leasing Regulations claims in no uncertain terms that state taxes are preempted, however, we briefly explain why our conclusion would not change even if we were to take deference into account.

As the preamble recognizes, "[t]he *Bracker* balancing test requires a particularized examination of the relevant State, Federal, and tribal interests." (77 Fed. Reg. 72440, 72447 (Dec. 5, 2012).) In concluding that the Leasing Regulations "occupy and preempt the field of Indian leasing," however, the preamble only considers federal and tribal interests. (*Id.* at pp. 72447-72448.) It is not difficult to see why; without any specific state tax to consider, the regulations are necessarily unable to consider the state's interests. Those interests could be strong, as was the case in *Cotton Petroleum*, or they could be minimal, as in *Bracker* and *Ramah*. In addition, the Department of the Interior's *Bracker* analysis in the preamble does not take the Long-Term Leasing Act or the congressional policy underlying it into account. The preamble's analysis is therefore largely incomplete, and so its reading of the Leasing Regulations is not reasonable

---

[19] Nor does conflict preemption apply, contrary to what plaintiffs contend. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) Plaintiffs argue that it is impossible for the County to comply with part 162.017 and state law at the same time, but given part 162.017's prefatory caveat, there is no impossibility.

enough to warrant deference. (See *Kisor v. Wilkie*, *supra*, 139 S.Ct. at pp. 2415-2416 ["If genuine ambiguity remains . . . the agency's reading must still be 'reasonable.' . . . And let there be no mistake: That is a requirement an agency can fail."].) Thus, on this issue, we agree with *Seminole Tribe*, which also concluded that the preamble was not dispositive. (See *Seminole Tribe*, *supra*, 799 F.3d at p. 1338 ["Because the Secretary's analysis did not examine *Florida's* interests in imposing this particular [tax], the balancing in the Preamble cannot substitute for the particularized inquiry required by *Bracker*."].)[20]

### C. Section 5108

Section 5108 was originally enacted as section 465 of title 25 of the United States Code, part of the Indian Reorganization Act of 1934 (Pub.L. No. 73-383 (June 18, 1934) 48 Stat. 984 (the Indian Reorganization Act). It authorizes the Secretary of the Interior to acquire "any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians." (25 U.S.C. § 5108.) It also provides that "any lands or rights acquired pursuant to this Act . . . shall be exempt from State and local taxation." (*Ibid.*)

---

[20] We note that the Department of the Interior has also recently taken the view that part 162.017 does *not* preempt any state taxes. (See *Desert Water Agency v. United States Department of the Interior* (9th Cir. 2017) 849 F.3d 1250, 1254 [noting, and agreeing, with Department of the Interior's view that "so far as preemption is concerned, part 162.017 has no legal effect at all: it does not purport to preempt any specific state taxes . . . or to alter the judge-made and judge-administered balancing test that has governed Indian preemption cases since at least 1980, when the Supreme Court decided *Bracker*"].)

Plaintiffs do not contend that the Secretary of the Interior acquired the land underlying the leases "pursuant to" the Indian Reorganization Act or its underlying regulations (see 25 C.F.R. §§ 151.1-151.8), as the parties agree the land underlying the leases was set aside for the tribe some decades before the legislation was enacted. Rather, they contend that the land need not have been acquired pursuant to the Indian Reorganization Act in order for section 5108 to apply. Specifically, they assert that "Indian lands taken in trust before and after the [Indian Reorganization Act] are subject to the same tax treatment" (italics omitted) and rely on a footnote from *Mescalero Apache Tribe v. Jones* (1972) 411 U.S. 145 (*Jones*) where the United States Supreme Court applied section 5108 to land that was "not technically 'acquired' 'in trust for the Indian tribe.'" (*Id.* at p. 155, fn. 11.) We reject these contentions and conclude that section 5108 does not apply.[21]

To begin with, the requirement that land be acquired "pursuant to" section 5108 is unambiguous. In such cases, "'our inquiry begins with the statutory text, and ends there as well.'" (*National Association of Manufacturers v. Department of Defense* (2018) 583 U.S. __ [138 S.Ct. 617, 631].) We take seriously, however, plaintiffs' contention that we should read section 5108 against the "backdrop" of federal Indian policy and history.

---

[21] As noted earlier, *Seminole Tribe* held that section 5108 preempted a Florida tax similar in some ways to the County's possessory interest tax. (*Seminole Tribe*, *supra*, 799 F.3d at pp. 1329-1335.) The parties in *Seminole Tribe*, however, did not contest whether the lands at issue there were acquired "pursuant to" section 5108. (See *id.* at p. 1329, fn. 6.) Much of the section 5108 analysis in *Seminole Tribe* is therefore inapplicable here.

(See *Santa Rosa Band of Indians v. Kings County* (9th Cir. 1975) 532 F.2d 655.) Moreover, *Jones* at least arguably introduces some ambiguity to section 5108. Neither of these considerations, however, changes our result.

At the time the Indian Reorganization Act was enacted in 1934, a "broad" reading of what is known as the intergovernmental tax immunity doctrine helped bar state and local governments from taxing Indian lands.[22] Under this broad reading of the doctrine, no state or local government could tax an "instrumentality" of the federal government. At the time, Indian lands were considered federal instrumentalities, and Indian tribes wards, such that they were immune from taxation. Thus, in *United States v. Rickert* (1903) 188 U.S. 432, 437-438, the court stated: "To tax [lands held in trust by the United States for Indians] is to tax an instrumentality employed by the United States for the benefit and control of this dependent race . . . . [I]f they may be taxed, then the obligations which the government has assumed in reference to these Indians may be entirely defeated . . . ."]. And in *Gillespie v. State of Oklahoma* (1922) 257 U.S. 501, 506, overruled by *Helvering v. Mountain Producers Corporation* (1938) 303 U.S. 376, 387, the court struck down a state tax on net income derived by lessees of Indian lands, stating that "a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms that it can for its wards."

---

[22] The intergovernmental tax immunity doctrine originates from *McCulloch v. Maryland*, which held that "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the . . . general government." (*McCulloch v. Maryland*, *supra*, 17 U.S. (4 Wheat.) at p. 436.)

Thus, when section 5108 first became law, it was true, as plaintiffs contend, that "Indian lands taken in trust before and after the [Indian Reorganization Act were] subject to the same tax treatment." Lands taken in trust before the Indian Reorganization Act were immune from state and local taxes under the broad reading of the intergovernmental tax immunity doctrine, and lands taken in trust after the Indian Reorganization Act were immune under that reading *and* section 5108. Since 1934, section 5108 has remained substantially the same. The broad reading of the intergovernmental tax immunity doctrine, however, has been repudiated, and with it the legal grounds for upholding automatic tax exemption for lands taken in trust prior to the Indian Reorganization Act.

As noted in *Jones*, the broad doctrine of intergovernmental tax immunity "did not survive." (*Jones*, *supra*, 411 U.S. at p. 150; see also *Cotton Petroleum*, *supra*, 490 U.S. at p. 174 ["Shortly after reaching its zenith in the *Gillespie* decision, the doctrine of intergovernmental tax immunity started a long path in decline and has now been 'thoroughly repudiated' by modern case law."]; *United States v. Fresno County* (1977) 429 U.S. 452, 460.) Less than two decades after Congress enacted the Indian Reorganization Act, the United States Supreme Court "cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation." (*Jones*, *supra*, 411 U.S. at p. 150, discussing *Oklahoma Tax Commission v. Texas Co.* (1949) 336 U.S. 342.)

Thus, although true in 1934, it is no longer the case that lands taken in trust before the Indian Reorganization Act—such as the land underlying plaintiffs' leases here—are

37

subject to the same state and local tax exemptions as lands acquired "pursuant to" section 5108. While the latter remains exempt due to statute, there is no longer any similar, automatic exemption for the former.[23]

Jones does not dictate otherwise. In Jones, the United States Supreme Court considered whether section 5108 prohibited New Mexico from imposing gross receipt taxes on a ski resort. (Jones, supra, 411 U.S. at p. 146.) The ski resort was operated by the Mescalero Apache Tribe but not located on its reservation, and the underlying land was leased from the federal government to the tribe. (Ibid.) In footnote 11, the court stated: "The ski resort land was not technically 'acquired' 'in trust for the Indian tribe.' But, as the Solicitor General has pointed out, 'it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe.' [Citation.] We think the lease arrangement here in question was sufficient to

---

[23] There remains today, as in 1934, a "narrow" reading of the intergovernmental tax immunity doctrine, whereby state and local governments may not directly tax federally-owned land. (See Van Brocklin v. Tennessee (1886) 117 U.S. 151, 175 ["[w]hether the property of the United States shall be taxed under the laws of a State depends upon the will of its owner, the United States, and no State can tax the property of the United States without their consent."]; Jefferson County, Alabama v. Acker (1999) 527 U.S. 423, 437 [since the 1930s, "we have closely confined the [intergovernmental tax immunity] doctrine to 'bar only those taxes that [are] imposed directly on one sovereign by the other."].) A narrow reading does not help plaintiffs here, however, given that the County's possessory interest tax taxes a private person's possessory interest in property rather than the property directly. (See United States v. Fresno County, supra, 429 U.S. at p. 453 [upholding California's possessory interest tax]; United States v. City of Detroit (1958) 355 U.S. 466, 470 ["A tax for the beneficial use of property, as distinguished from a tax on the property itself, has long been a commonplace in this country."].)

bring the Tribe's interest in the land within the immunity afforded by [section 5108]." (*Id.* at p. 145, fn. 11.)

Plaintiffs read footnote 11 as providing that land falls under section 5108 anytime it would be "meaningless" for the United States to convey title to itself. We do not read footnote 11 as sweeping so broadly. Under such a view, all federally-owned land provided for a tribe's use would fall under section 5108, regardless of whether the land was acquired before or after passage of the Indian Reorganization Act, and regardless of whether the land was acquired "pursuant to" section 5108 or its underlying regulations. (See, e.g., 25 C.F.R. § 151.11 [listing criteria that the Secretary of the Interior must consider in evaluating requests for off-reservation acquisitions].) This would render the requirement that land be acquired "pursuant to" section 5108 a dead letter, and we doubt that *Jones* intended such a drastic result, much less by implication in a footnote.

Unfortunately, although *Jones* found the lease arrangement between the Tribe and the federal government "sufficient" for purposes of section 5108, it provided no explicit explanation as to why. (See Pomp, *The Unfulfilled Promise of the Indian Commerce Clause and State Taxation* (2010) 63 Tax Law. 897, 1052 ["Without any discussion about why the [Indian Reorganization] Act required that land be acquired and held in trust for the Tribe, or about the differences in rights and obligations between a landlord and lessee compared with a trustee and beneficiary, or whether the statute would have been satisfied if the federal land were placed into a trust for the benefit of the Tribe and why that was not done, Justice White merely announced that [section 5108] applied."].) There are two

39

important factual distinctions, however, between this case and *Jones*. The first is that the ski resort in *Jones* had been developed with money provided by a different section of the Indian Reorganization Act. (*Jones*, *supra*, 411 U.S. at p. 146 [noting that ski resort was "developed under the auspices of the Indian Reorganization Act" and that "equipment and construction money was provided by a loan from the Federal Government under § 10 of the [Indian Reorganization] Act."]) The second is that the federal government had, in all likelihood, leased the land to the tribe *after* the Indian Reorganization Act had been enacted.[24] In our view, these two facts, whether separately or in combination, had to have had some bearing on the court's conclusion in footnote 11; otherwise, as discussed in the previous paragraph, the "pursuant to" requirement would be satisfied anytime the government provided use of its property to a tribe, which we do not believe to be the case. Furthermore, given that neither of those facts are present here, we find *Jones* distinguishable on this point. (See also *Agua Caliente Band of Cahuilla Indians v. Riverside County*, *supra*, 2017 U.S. Dist. LEXIS 92592 at [*21] [distinguishing "circumstances that gave rise to the [Tribe's] [r]eservation" from those in *Jones*], affd. mem. (9th Cir. 2019) 749 Fed. Appx. 650.)[25]

---

[24] The opinion does not state when the lease was entered into, but *Jones* was decided almost 40 years after passage of the Indian Reorganization Act. (*Jones*, *supra*, 411 U.S. at pp. 145-146.) Moreover, as noted, the ski resort was "developed under the auspices of the Indian Reorganization Act" with funds provided pursuant to it. (*Id.* at p. 146.)

[25] "Although we may not rely on unpublished California cases, the California Rules of Court do not prohibit citation to unpublished federal cases, which may properly

40

Accordingly, section 5108 does not apply, and it therefore cannot prevent the County from imposing the possessory interest tax on plaintiffs here.

*D.  Conclusion*

We held nearly 50 years ago in *Palm Springs Spa* that the County may impose its possessory interest tax on federally owned land set aside for the benefit of the Tribe. Despite *Bracker* and part 162.017, which became law only afterward, and section 5108, which was not at issue in *Palm Springs Spa*, we see no reason to depart from our previous holding or from similar holdings from the Ninth Circuit.  This possessory interest tax is valid.

be cited as persuasive, although not binding, authority." (*Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 251, fn. 6.)

## III.  DISPOSITION

The judgment is affirmed. The County is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL
J.

We concur:

MCKINSTER
Acting P. J.

MENETREZ
J.